UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 07-10277-NMG

UNITED STATES OF AMERICA

v.

ALBANIA DELEON

**REPORT AND RECOMMENDATION RE:**
**MOTION PURSUANT TO 28 U.S.C. § 2255 TO VACATE,**
**SET ASIDE, OR CORRECT SENTENCE (DOCKET ENTRY # 200)**

**May 9, 2016**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to vacate, set aside or correct a sentence filed pro se by defendant Albania Deleon ("defendant" or "Deleon"), an inmate at the Federal Correctional Institute in Danbury, Connecticut ("FCI-Danbury") pursuant to 28 U.S.C. § 2255 ("section 2255").  (Docket Entry # 200).  On December 12, 2014, the United States of America ("the government") filed a response in opposition to the section 2255 motion addressing inter alia the ineffective assistance of counsel claim.  (Docket Entry # 206).  Thereafter, defendant submitted a reply brief.  (Docket Entry # 213).

PROCEDURAL BACKGROUND

On June 8, 2007, Deleon and Jose Francisco Garcia-Garcia ("Garcia-Garcia") were arrested as the result of a criminal complaint filed on the previous day.  (Docket Entry # 1).  On August 22, 2007, both Deleon and Garcia-Garcia were indicted on one count of making false statements in violation of 18 U.S.C. § 1001 and one count of aiding and abetting in violation of 18 U.S.C. § 2.  (Docket Entry # 16).  A Superseding Indictment issued on March 12, 2008, charged defendant with one count of conspiracy in violation of 18 U.S.C. § 371, five counts of making false statements in violation of 18 U.S.C. § 1001, 16 counts of procuring a fraudulent tax return in violation of U.S.C. § 7206(2) and six counts of mail fraud in violation of 18 U.S.C. § 1341.  (Docket Entry # 37).  After an 11 day jury trial, beginning on November 3, 2008, defendant was found guilty on all counts in the Superseding Indictment.  (Docket Entry # 77).  Sentencing was initially scheduled for March 23, 2009, but the hearing did not take place until September 9, 2011.[1]  Upon being returned to the United States in December 2010, defendant requested new counsel and Attorney Jessica Hedges ("Attorney

---

[1] The protracted duration of time between conviction and sentencing was in part due to defendant fleeing the country shortly after her conviction.  (Docket Entry # 99).  On October 30, 2010, Deleon, who had since been residing in the Dominican Republic under the alias Elba Henriquez Pena, was apprehended by Dominican authorities and subsequently extradited to the United States in December 2010.  (Docket Entry # 111).

Hedges") was appointed to represent defendant.  (Docket Entry ##

119 & 117).  Defendant's sentencing hearing commenced on

September 9, 2011 and concluded on September 13, 2011, when

defendant was sentenced to 87 months of incarceration, three

years probation and $1,569,954.45 in restitution.  (Docket Entry

## 158 & 162).  Deleon appealed her conviction and sentence and

on January 14, 2013, the First Circuit affirmed the district

court's judgment.  (Docket Entry # 183).  On November 7, 2013,

defendant's petition for a writ of certiorari to the Supreme

Court was denied.  (Docket Entry # 195).  Defendant thereafter

filed the section 2255 motion pending before this court.

The motion alleges two grounds for vacating the sentence.

(Docket Entry # 200, Ex. 2, 3).  First, defendant challenges her

November 9, 2008 conviction, as well as the sentence imposed on

her, on the basis of ineffective assistance of counsel.

Defendant's motion identifies six instances of trial counsel

Carl N. Donaldson's ("Donaldson")[2] ineffectiveness, stating that

---

[2]  Trial counsel will only be referred to as "Donaldson" rather
than "Attorney Donaldson" due to his November 23, 2011
disbarment.  Entries in Donaldson's Massachusetts Bar of
Overseers Disciplinary Record show that prior to representing
defendant at trial, Donaldson had committed multiple infractions
which resulted in sanctions, several of which he failed to obey.
Shortly after he disengaged representation with Deleon, his
license to practice law in Massachusetts was revoked
permanently.  See Matter of Donaldson, 22 Mass. Att'y Disc. R.
278 (2006) (suspending Donaldson's license to practice for two
months); see also Matter of Donaldson, SJC No. BD-2010-110

Donaldson:  (1) not only failed to object to the district
judge's suggestion of submitting three summary chalks ("chalks")
into the jury room during deliberations, he explicitly consented
to the submission thereby leading to a less favorable, plain
error standard of review on appeal; (2) failed to hire a tax
expert to challenge the government's loss calculus which led to
defendant being held liable for an overestimated restitution
obligation; (3) failed to discuss the presentence report ("PSR")
with defendant prior to sentencing; (4) failed to retain an
expert witness who could rebut the trial testimony of Garcia-

---

(April 4, 2011) (suspending Donaldson's license to practice for
six months); see also In Re: Carl N. Donaldson, SJC No. BD-2012-
045 (Sept. 5, 2012) (SJC judgment of disbarment).  It should be
noted that Donaldson's license to practice law remained valid
during the entire period of time he represented defendant.
Defendant has highlighted Donaldson's disciplinary record, as
well as his disbarment, but has not brought forth any claim that
these proceedings were detrimental, or even affected,
Donaldson's ability to properly represent her.  In Comm. v.
Wilson, the Massachusetts Supreme Judicial Court held that the
fact the defense counsel had previously been disbarred for
defrauding a client was irrelevant to an ineffectiveness inquiry
in a subsequent case where "[t]he record reveals a well-prepared
attorney."  Commonwealth v. Wilson, N.E. 919, 932 n.23 (Mass.
2004).  In Young, the Ninth Circuit concluded that counsel's
disbarment subsequent to representing the defendant for events
that occurred prior to that representation did not amount to
extrinsic ineffectiveness.  Young v. Runnels, 435 F.3d 1038 (9th
Cir. 2006) (attorney remained in good standing throughout
representation and no indication she was unable to provide
effective representation to client); see also Morelos v. U.S.,
709 F.3d 1246 (8th Cir. 2013) (when Morelos hired attorney, he
was licensed to practice law in three states, but he was
suspended from practicing law in two of the three states during
trial; this was not extrinsic ineffectiveness because it had no
effect on his representation of Morelos).

Garcia; (5) was overwhelmingly deficient and exposed defendant to a harsh and severe sentence by advising her to take the case to trial and testify on her own behalf; and (6) delayed forwarding trial materials to new counsel and failed to open "important mail from the court and government." (Docket Entry # 200-2).

As a second ground of relief, defendant claims she is entitled to re-sentencing in light of Alleyne v. United States, 133 S.Ct. 2151 (2013). (Docket Entry # 200-3). Defendant submits that due to the sentencing court's adoption of an erroneous tax calculus, which was not proven to be accurate beyond a reasonable doubt, her restitution obligation was overstated and caused her to be improperly classified into a higher tranche of the sentencing guideline range. (Docket Entry # 200-3).

The motion does not request an evidentiary hearing. Nevertheless, even if one had been requested, such a hearing is not required to resolve the motion. As discussed in greater detail infra, even accepting defendant's nonconclusory statements of facts, she is not entitled to relief. See Owens v. United States, 483 F.3d 48, 60-61 (1st Cir. 2007); David v. United States, 134 F.3d 470, 477 (1st Cir. 1998) (setting forth evidentiary hearing standard in section 2255 proceeding). A district court may make a preliminary assessment of a section

2255 motion's merits on an expanded record that may include "in an appropriate case, even affidavits." Miller v. United States, 564 F.2d 103, 115 (1st Cir. 1977). Evidentiary hearings on section 2255 petitions "are the exception, not the norm," and petitioners bear a "heavy burden" to demonstrate that one is warranted. Moreno-Morales v. United States, 334 F.3d 140, 145 (1st Cir. 2003). An evidentiary hearing is also not required to effectively evaluate defendant's claims because the record is sufficient to resolve the instances of conduct about which defendant complains. Furthermore, the motion does not dispute any material facts which would require an evidentiary hearing. Therefore, the motion to vacate together with the government's response are ripe for review. (Docket Entry ## 200, 206, 213).

### BACKGROUND[3]

## I. ECT and MSI's Business Relationship and Failure to Pay Taxes

Beginning in 2000, defendant owned and operated two symbiotic businesses: Environmental Compliance Training ("ECT"), an asbestos removal training and certification program, and Methuen Staffing, Inc. ("MSI"), a temporary employment

---

[3] "A section 2255 petition must be dismissed whenever 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" United States v. Williams, 2012 WL 2149823, *1, *2 (D.Mass. March 22, 2012). The underlying facts are taken from the entire record and do not address the full scope of Deleon's criminal enterprise, only what is relevant to the claims alleged by the section 2255 motion.

agency that supplied workers to various sites throughout New
England.  (Docket Entry # 168, p. 74).  Through services offered
by ECT, individuals who sought to be employed in lead and
asbestos abatement services would be trained according to state
and federal regulations, tested and eventually issued worker
certifications which authorized them to perform the abatement
services.  (Docket Entry # 170, p. 93).  MSI, which was housed
in the same office space as its sister company ECT, would hire
graduates of ECT's training program as temporary workers and
have them dispatched to businesses, often requiring lead and
asbestos abatement services.  (Docket Entry # 170, p. 95)
(Docket Entry # 168, p. 79).  Upon defendant's direction, ECT
employees would routinely issue fraudulent credentials to
individuals who had neither participated in the training
courses, nor completed any of the requisite examinations, in
exchange for an extra fee.  (Docket Entry # 170, p. 116).  After
accepting the cash fee, ECT would regularly submit fraudulent
certificates, falsified attendance and training sheets, as well
as doctored examination results to the Massachusetts Division of
Occupational Safety ("DOS").  (Docket Entry # 176, pp. 37-55,
111).  Defendant frequently relied on one of her subordinates,
Garcia-Garcia, to doctor ECT class sheets, dispense asbestos
certifications and direct MSI workers to different job sites.
(Docket Entry # 135, pp. 41-44).  By allowing individuals to pay

ECT a higher fee in order to bypass coursework and become certified, MSI was able to develop a workforce consisting of as many as 900 laborers.  (Docket Entry # 173, p. 115).

Meanwhile, even though defendant would represent to client companies, as well as DOS, that MSI would be responsible for all employee tax obligations, MSI's actual practice was to make use of two separate payrolls in order to conceal the company's true size and actual tax liability.  (Docket Entry # 170, p. 55) (Docket Entry # 164, p. 34).  MSI compensated a minority of its employees through an external payroll service.  For those employees listed on this "reported payroll," compensation was reported and payroll taxes were withheld.  (Docket Entry # 166, p. 19).  The majority of MSI employees, however, were paid through a secondary "unreported" payroll system managed directly under defendant's oversight.  (Docket Entry # 164, pp. 36-38). Defendant used the unreported payroll to directly issue MSI paychecks to workers without withholding, or reporting, any payroll or income taxes.  (Docket Entry # 172, p. 96). Defendant explained to accountants retained by MSI that the workers paid through the unreported payroll were independent contractors whom she was not required to remit payroll taxes. (Docket Entry # 172, p. 97-98).  As such, when MSI accountants prepared the companies' tax filings, they recorded the total amount of the checks from the unreported payroll as a business

expense and issued Form 1099s to these individuals, purporting to reflect payments to them as subcontractors rather than employees.  (Docket Entry # 172, pp. 142-145).  By concealing the true size of MSI's staffing payroll to the Internal Revenue Service ("IRS"), defendant was able to avoid paying the employer share of payroll taxes and also avoid withholding and paying the employee share of the payroll taxes to the government.  (Docket Entry # 167, pp. 147-152).  Defendant's contemporaneous misrepresentations of MSI's workforce to the company's insurance provider, AIM Mutual Insurance Company ("AIM"), only accounted for MSI's workforce listed on the reported payroll and represented that MSI did not make use of independent contractors, thereby reducing the workers compensation insurance premiums MSI was required to pay.  (Docket Entry # 167, pp. 113-118).

II.  Undercover Investigation of ECT and MSI

Upon being alerted of potential immigration violations and document fraud occurring at ECT and MSI, on September 30, 2006, state and federal investigators conducted an undercover sting operation.  (Docket Entry # 165, p. 68).  During the sting operation, an Immigration and Customs Enforcement ("ICE") agent, who posed as an illegal alien, negotiated and purchased falsified credentials which would then enable him to apply for a state asbestos removal license.  (Docket Entry # 165, pp. 68-

9

74).   In November 2006, a raid was performed at ECT's and MSI's shared office space, in which authorities uncovered substantial evidence of document fraud, tax and insurance evasion and immigration violations.   Once defendant became aware of the investigation, she retained the services of Donaldson to represent her.   On August 22, 2007, defendant and Garcia-Garcia were both indicted on one count of making false statements and one count of aiding and abetting.   (Docket Entry # 16).   On October 4, 2007, Garcia-Garcia entered into a plea agreement with the government which stipulated that, in exchange for his full cooperation with the investigation and trial testimony against Deleon, he could plead guilty to reduced charges with a recommendation for a reduced sentence and receive criminal immunity for any information he provided.   (Docket Entry # 24). A Superseding Indictment issued on March 12, 2008, charging only Deleon with one count of conspiracy to violate multiple federal criminal laws, five counts of making false statements, 16 counts of procuring false tax returns and six counts of mail fraud. (Docket Entry # 37).

III.   <u>Delon's Trial and Use of Summary Chalks</u>

Defendant's trial began on November 3, 2008, and lasted 11 days before the jury found defendant guilty of all charges. (Docket Entry # 77).   The theme of Donaldson's opening statements and trial strategy as a whole regarding the fraud

allegations was to mitigate defendant's culpability by showing
the jury that any fraud which may have occurred at ECT or MSI
had actually been perpetrated in defendant's absence by several
of her employees whom defendant had mistakenly trusted.  (Docket
Entry # 169, pp. 182-183) (Docket Entry # 135, pp. 50-51).  Over
the course of the trial, the government called 18 witnesses,
seven of whom were former staff for ECT and MSI.  These
employees testified in detail about how Deleon carefully
shepherded her business, her awareness of MSI's daily business
operations and how her imperious oversight encompassed all
levels of MSI's activities.  Juan Sandoval ("Sandoval"), an
office employee of both ECT and MSI, testified that Deleon "knew
everything that went around in the office" and that before he
could begin the process of creating an individual's false
certifications, he was first required to get defendant's direct
approval.  (Docket Entry # 170, pp. 96, 117).  Testimony from
MSI/ECT office employees provided explicit details regarding
ECT's process of creating false credentials and revealed that a
majority of the decisions to engage in the illegal activity were
done so with defendant's approval and oversight.  (Docket Entry
# 170, pp. 112-126, Ex. 109F) (Docket Entry # 164, p. 191)
(Docket Entry # 135, pp. 9-22, Ex. 116B, 116C, 116C, 107)
(Docket Entry # 166, pp. 29-35, Ex. 103) (Docket Entry # 135,
pp. 9-22).  These witnesses were presented with documents seized

during the investigation, such as blank exams which received passing grades, registration forms for classes, attendance rosters for non-existent classes, completion certifications and various other forged documents, and each witness testified to having personal involvement in perpetuating the fraud under defendant's direction.

On the second day of trial, prior to any witness testimony being heard, the government informed the court that it intended to make use of several summary chalks, as well as pass out evidence binders to the jury, referencing exhibits which both parties had previously stipulated to. (Docket Entry # 62) (Docket Entry # 170, p. 6). The first government witness called was Brian Wong ("Wong"), a field supervisor from DOS. (Docket Entry # 170, p. 7). Wong's testimony described state training and testing requirements for ECT's certification program and the required DOS filings that ECT would make regarding its graduates. (Docket Entry # 170, p. 23). To guide the jury through Wong's testimony, the government made use of a summary chalk titled "False Statement Counts," which was taken from the chart found in the false statement charge of the Superseding Indictment and supplemented with a column of admitted trial exhibits which corresponded to the false statements described in Wong's testimony. The chalk was published so that each juror

viewed a copy of the chalk and all the exhibits referenced on it could be found in the binder they had previously been given.

On the sixth day of trial, the government called Deleon's former co-defendant, Garcia-Garcia, to testify.[4]  (Docket Entry # 135, p. 26).  During direct examination, Garcia-Garcia explained to the jury that he had already pled guilty to his involvement in this matter and that he had entered into a plea agreement with the government, which stipulated that he would provide his full cooperation with the investigation in exchange for a recommendation for a reduced sentence.  (Docket Entry # 135, pp. 32-35).  Through Garcia-Garcia's testimony, the jury heard corroborating details regarding many of the illicit business practices undertaken at ECT and MSI, and how defendant embedded those practices into the daily course of business for both companies.  (Docket Entry # 135, pp. 29-65).  Throughout Garcia-Garcia's direct examination, he was shown segments of covert surveillance videos shot from a "button camera," which was attached to the clothing of a cooperating employee during the undercover sting operation.  (Docket Entry # 135, pp. 29-57).  Garcia-Garcia was asked to describe the documents, events and people seen in the surveillance videos taken while the

---

[4]  In December 2007, Garcia-Garcia pled guilty to the sole count in the August 2007 Indictment.  He was not named in the superseding Indictment.

undercover ICE agent arranged and subsequently purchased forged certifications at ECT.  (Docket Entry # 169, p. 172) (Docket Entry # 135, pp. 29-41, 55-57).  Upon cross-examination, Donaldson's questions to Garcia-Garcia were designed to impeach the credibility of his direct testimony.  Donaldson inquired into the plea agreement which Garcia-Garcia had entered into, possible immigration benefits, and pointed out his personal interest to deliver testimony which would be favorable to the government.

In addition to the fraudulent certifications being issued at MSI, the government presented ample evidence at trial that defendant had knowingly misclassified MSI employees as independent contractors in order to avoid contributing the employer's share of payroll tax, social security, Medicaid and unemployment contributions and that she misrepresented the size of her workforce to insurers in order to reduce the size of her insurance premiums.  Witness testimony from multiple MSI employees, both administrative and laborers, revealed that workers hired by MSI were given the option of choosing whether or not to withhold deductions, and those that choose not to withhold were issued a weekly check, printed at the MSI office, and drawn from an account which was referred to as the "under-the-table" payroll.  (Docket Entry # 164, pp. 34-45, 110). Accountants Nestor DeJesus ("DeJesus") and Robert Korbey

("Korbey"), both of whom had been retained by MSI, testified

that they had advised defendant on payroll and tax matters, and

that, while their business relationship existed with defendant,

both had explained to her how to distinguish a 1099 independent

contractor from a W2 employee.  (Docket Entry # 172, pp. 87-88,

142-144).[5]

The final two witnesses called to testify by the government

were IRS Agent Joseph Guidoboni ("Guidoboni" or "Agent

Guidobani") and John MacDougall ("MacDougall"), an auditor from

AIM assigned to calculate what MSI's insurance premium would

have been had the company reported the true size of its payroll.

(Docket Entry ## 167 & 168).  Guidoboni testified that he had

reviewed MSI quarterly payroll tax returns, the records from

MSI's payroll services, the checks issued to workers through the

unreported payroll and MSI's bank statements.  (Docket Entry #

167, pp. 124-149).  Despite multiple hearsay objections from

Donaldson, Guidoboni's testimony frequently referred to a

spreadsheet prepared by IRS workers, comprised of data taken

from approximately 13,000 checks issued by MSI from 2002 thru

2005.  (Docket Entry # 167, pp. 133-137).  Guidobani explained

in detail each step of how the spreadsheet was created and what

---

[5]  DeJesus managed MSI's payroll tax matters when the company was
established in 2000.  Thereafter, Korbey advised defendant from
January 2001 to January 2006.

data was used to create each column in the list.  (Docket Entry
# 167, pp. 134-149).  The agent testified that the column in the
spreadsheet which represented a record of MSI's unreported
payroll was created by looking at the memo line of checks
written to see if there was hour or wage information, and that
he excluded checks if he felt the recipient was not an MSI
employee.[6]  (Docket Entry # 167, pp. 135-136).  As Guidobani
explained how he had broken the spreadsheet down into fiscal
quarters, the government introduced a summary chalk titled
"False Tax Return Counts," which was then marked as "Exhibit A"
for identification and then circulated to the jury.  (Docket
Entry # 167, p. 140).  (Docket Entry # 76).  The chalk was not
admitted into evidence as an exhibit.  (Docket Entry # 167, p.
140).  Much like the "False Statement" chalk, this chalk was

---

[6]  Specifically, Guidobani testified:

> The basis was that in reviewing the spreadsheets, the
> checks on the spreadsheet, I did see checks that didn't
> have any memo or anything recorded in the memo section, so
> I had to make a determination whether to include those or
> not.  So what I did was I looked at the payee, and if the
> payee was issued a check that had the regular hours or
> hourly rate written on it, I would include that check
> subject to the employment tax calculation.  If it was -- if
> the payee -- if I was looking at a check and the payee --
> excuse me.  If the remark section did not have any hourly
> wage rate or the number of hours worked and I didn't see
> another check that the payee received with notations, I
> would not put it in the spreadsheet.

(Docket Entry # 167, p. 136).

sourced from the chart found in the false tax return charge of

the Superseding Indictment.  While the original chart found in

the Superseding Indictment summarized information which the

government had extracted from the reported compensation line

found in each of the 15 MSI quarterly tax filings, all of which

had previously been admitted into evidence as exhibits ten thru

25, the summary chalk at trial contained one additional column

of trial evidence labeled "Actual Line 2 Compensation" which

listed Agent Guidoboni's calculations.  (Docket Entry # 167, p.

141, Ex. A).  Agent Guidoboni testified that his investigation

uncovered that the total amount MSI owed was $1,074,858.70.

(Docket Entry # 167, p. 149).  Donaldson's cross-examination of

Agent Guidobani elicited that while the agent was calculating

the payroll taxes, he never attempted to distinguish

misclassified 1099 workers from those who were accurately

classified, and that his payroll tax calculations operated on

the assumption that all MSI workers were actual employees for

tax purposes.  (Docket Entry # 168, p. 5).

MacDougall was the government's last witness and much of

his testimony resonated what Agent Guidobani had previously

stated, in that, through misrepresentations MSI had made to

insurers, AIM had incurred losses totaling approximately

$369,015.  (Docket Entry # 168, pp. 8-41).  In arriving at that

figure, MacDougall testified that he had relied on the same IRS

17

spreadsheet data which Agent Guidobani used and, by breaking down the "unreported payroll" data into fiscal quarters, then recalculating the premium based on MSI's actual payroll, he was able to approximate a loss figure.  (Docket Entry # 168, pp. 8-41).  The government guided the jury through a complicated set of transactions by using a third summary chalk titled "Mail Fraud Counts," which was marked as "Exhibit B" for identification, not admitted into evidence and then circulated to the jurors.  (Docket Entry # 168, pp. 18-19).  Similar to the other two chalks, this chalk was a duplicate of the chart found in the mail fraud charge of the Superseding Indictment supplemented with a column of admitted trial exhibits which corresponded to the mailings described and admitted during MacDougall's testimony.[7]  While being cross-examined by Donaldson, MacDougall acknowledged that in arriving at the loss figure, he had only used the data provided to him by the IRS and that, to some extent, the figure was hypothetical and might not be accurate.  (Docket Entry # 168, pp. 44-45).

Once the government rested its case, Donaldson began his defense by calling defendant to testify on her own behalf.

---

[7]  The "False Tax Return Counts" and "Mail Fraud Counts" chalks were respectively marked by the court as Exhibit A and Exhibit B.  The "False Statement Counts" chalk was not given an identification letter during trial.  None of the chalks were admitted into evidence during the trial testimony.

(Docket Entry # 168, p. 73).  When asked about ECT/MSI's tax structure, defendant testified that she had very limited educational background, she had only a very basic understanding of complicated tax matters, she primarily relied on the advice of her accountants and that she was never instructed how to make the distinction between an employee and an independent contractor.  (Docket Entry # 168, pp. 75, 109-112).  Throughout her testimony, Deleon repeatedly acknowledged that fraud may have occurred at both of the companies, but she denied having any involvement in illegal activity and pointed blame to several of her subordinates, who she alleged capitalized on her absence. (Docket Entry ## 168 & 173).

On November 19, 2008, closing arguments from both sides were made to the jury.  (Docket Entry # 174).  During the government's closing argument, the three chalks which were presented over the course of trial were again used by the prosecutor to discuss the various charges against defendant. (Docket Entry # 174, pp. 13-15, 18-20, 27-29).  When deliberations commenced, the jury was given all the evidence contained in the record, including the Superseding Indictment. The chalks did not go to the jury room at this time.  (Docket Entry # 174, p. 98).

Approximately three hours into deliberations, the jury sent out a question inquiring about the possibility of having "the

exhibit numbers indicated on the verdict form."[8]  (Docket Entry #
174, pp. 98-99).  The district judge noted that the exhibit
numbers were listed on the chalks, which were not entered into
evidence and therefore not in the jury room, and asked if either
party had any suggestions on how to respond to the request.
(Docket Entry # 174, p. 99).  The government suggested that,
because the chalks reflected nothing more than how the exhibits
relate to the counts found in the Superseding Indictment,
providing the jury with access to the chalks would be an
appropriate course of action.  (Docket Entry # 174, p. 99).
Donaldson's response to the request was "I don't have a problem
with that," and he indicated he wanted to review the chalks to
be sure they did not reflect anything other than the counts in
the Superseding Indictment and the exhibits relating to each
count.  (Docket Entry # 174, p. 100).  The record does not state
whether Donaldson inspected the chalks, but he proceeded to say
"Your Honor, I'm fine with that.  We were just talking about
it."  (Docket Entry # 174, p. 100).  Finally, after some further
discussion as to the location of the chalks, the court asked if
Donaldson agreed with the proposal, to which Donaldson stated,

---

[8]  The note submitted to the court read, "Would it be possible to
have the exhibit numbers indicated on the verdict form?  Given
the number of counts and amount of evidence it would be
helpful."  (Docket Entry # 76-3).

"I'm satisfied, your Honor."  (Docket Entry # 174, p. 100).
Upon Donaldson's consent, the chalks were taken directly to the
jury room, without any limiting instruction from the court on
how they could be used.[9]  (Docket Entry # 174, p. 100).
Approximately 90 minutes later, the jury returned the verdict of
guilty on all counts.  (Docket Entry # 174, pp. 100-101).

III.   Defendant's Flight and Subsequent Sentencing

     Defendant's sentencing hearing was initially scheduled to
take place on February 18, 2009, however, after being continued
twice to March 23, 2009, defendant failed to appear and a
warrant for her arrest was issued.  (Docket Entry ## 92, 94,
101).  Upon the court's issuance of a warrant for defendant's
arrest, the United States Attorney's Office and United States
Marshals Service assigned numerous officers to conduct a

---

[9]  The record reads:

     THE COURT:  All right. Is there any reason that the Court
     just simply can't submit those chalks in response without
     calling the jury back in and doing it on --

     MR. MITCHELL:  I don't think so.

     THE COURT:  What I will do then, as soon as you get me the
     chalks and run them by Mr. Donaldson that he agrees.

     MR. DONALDSON:  I'm satisfied, your Honor.

     THE COURT:  Give me those three chalks. I will give them to
     the deputy, who will turn them over to the marshal, who
     will give them to the jury.

(Docket Entry # 174, p. 100).

nationwide search in an attempt to apprehend defendant.  (Docket
Entry # 111, p. 2).  Nearly six months into the search,
authorities determined that defendant had returned to the
Dominican Republic where she had a considerable support network
of friends and family.  (Docket Entry # 111, p. 2).  After a
year of coordination between the State Department and Dominican
authorities, on November 23, 2010, the warrant was executed in
Santo Domingo, where defendant had been living under a false
identity.  (Docket Entry ## 99 & 111).

Upon being extradited to the District of Massachusetts, a
significant breakdown in the attorney-client relationship
between defendant and Donaldson led defendant to seek new
counsel.  On February 8, 2011, Attorney Hedges was appointed to
represent defendant in any further proceedings.  (Docket Entry #
119).  In Donaldson's motion to withdraw as counsel, he asserted
that since defendant's return to the United States, he had "met
with the Defendant to discuss her case and review her PSR
consistent with the Sentencing Procedures . . . Defendant
refused to review the PSR with me to prepare for her
sentencing."  (Docket Entry # 117).

Prior to defendant's sentencing hearing on September 9,
2011, Attorney Hedges was granted three continuances, which she
justified were required, largely in part, because of the
factually and legally complex nature of defendant's case and

that, in order for her to "complete the review of the relevant
discovery, conduct the necessary research and work with
appropriate experts to understand the allegations, and –
ultimately – effectively represent her client at sentencing,"
extra time must be granted.  (Docket Entry ## 120 & 149) (Docket
Entry # 141, p. 3).  Attorney Hedges also noted that significant
frustrations have arisen during her "repeated and persistent
efforts" to contact Donaldson and obtain defendant's trial
materials.  (Docket Entry # 149, p. 2).  Attorney Hedges later
submitted 77 objections to defendant's PSR, two sealed
submissions and secured funds to retain forensic accountant Carl
Jenkins ("Jenkins"), who examined the government's methodology
for determining tax loss.  (Docket Entry ## 142, 153) (Docket
Entry # 176, p. 4).  Jenkins authored a comprehensive report
that criticized several key components of the government's
methodology for calculating loss, but the report did not provide
an alternative figure.  (Docket Entry # 153-2).  The report was
included as an exhibit in defendant's Sentencing Memorandum and,
while Jenkins made himself available to testify during the
hearing, the court declined to hear the testimony, over Attorney
Hedges' objection.  (Docket Entry # 176, p. 7).

    Over the course of the two day sentencing hearing, both
parties put forth comprehensive arguments relating to the loss
measurement.  Attorney Hedges pointed out several entries in the

IRS spreadsheet which, by Agent Guidoboni's own testimony, should have been excluded from the loss figure.[10]  After a number of concessions were made by the government on the first day, the court reluctantly suspended the hearing and asked that the government submit a final position on what it believed the correct tax loss figure should be and reasons why Jenkin's report should not be adopted.  (Docket Entry # 176, p. 21). Eventually, following additional arguments, the court adopted the loss figures submitted by the government and defendant was sentenced to 87 months incarceration, three years of probation and $1,569,954.45 in restitution.  (Docket Entry # 162, p. 7). In arriving at that loss figure, the court stated:

> Notwithstanding defense counsel's arguments, vigorous arguments and submissions over these last several days, based upon her expert, Mr. Jenkins' conclusions, the Court agrees with the probation officer and the government that the tax loss in this case is just over $1.2 million and that the insurance premium loss is just over $369,000.
>
> It comes to this conclusion on the basis of the government's expert at trial, IRS Agent Guidaboni, and the arguments of the probation officer and of the assistant United States attorney, and being fully cognizant of the commentary in Application Note 1 of the tax evasion guideline, namely Section 2T1.1, that when the amount of the tax loss may be uncertain, the guidelines contemplate that the Court will simply make a reasonable estimate based upon available facts.

---

[10]   Attorney Hedges provided examples of checks drafted for regular business expenses, like computer repairs and energy expenses, which had been classified as employee wages and improperly included into the loss calculation.

With respect to the insurance premium loss, under the
mail fraud counts, the Court correspondingly notes
that Application Note 3(c) of Section 2B1.1 states
that the Court need only make a reasonable estimate of
the loss based upon available information.  Of course,
the Court makes these findings on the basis of the
preponderance of the evidence standard that is
applicable for sentencing findings.

Although the Court also accepts the revenue agent's
withholding calculations of the tax evasion loss -- by
my understanding, that was $423,000 of the $1.2
million loss -- it notes that that portion of the loss
determination is academic from a guidelines
calculations standpoint because even if that portion
of the loss is completely disregarded and the loss,
therefore, becomes somewhere around $777,000,
application of the guidelines with respect to the
grouping of multiple offenses would result in exactly
the same total offense level of 29.

(Docket Entry # 177, pp. 16-17).

On September 15, 2011, defendant filed a notice of appeal

and the government filed a motion to dismiss Count One of the

August 22, 2007 Indictment.[11]  (Docket Entry # 158) (Docket Entry

# 160).  On May 21, 2012, Attorney Hedges filed a motion, which

---

[11]   Defendant's three grounds for appeal alleged that:  (1) the
trial judge committed plain error in submitting chalks, prepared
by the prosecution and used during the prosecution's closing, to
the jury during deliberations; (2) the government's loss
estimate at sentencing was not proven by a preponderance of the
evidence and it was clear error for the court to rely on the
figure in determining the defendant's guideline sentencing
range; and (3) the district court erred under Fed.R.Crim.P. 32
in failing either to inquire directly of the appellant as to her
opportunity to review and discuss the presentence report, or to
make abundantly clear on the record that both the appellant and
her counsel had had an adequate opportunity for such review.
See Brief for Appellant, United States v. Delon, 704 F.3d 189
(1st Cir. 2013) (No. 11-2150).

was granted the next day, to reopen and modify the trial record
to admit the three summary chalks that were allowed into the
jury room.  (Docket Entry ## 179 & 182).  On January 14, 2013,
the First Circuit affirmed defendant's conviction and
restitution obligation.  (Docket Entry # 184).

DISCUSSION

## I.   Section 2255 Review

Section 2255 "provides for post-conviction relief in four
instances, namely, if the [defendant's] sentence (1) was imposed
in violation of the Constitution or laws of the United States,
or (2) was imposed by a court that lacked jurisdiction, or (3)
exceeded the statutory maximum, or (4) was otherwise subject to
collateral attack."  Damon v. United States, 731 F.3d 1, 4 (1st
Cir. 2013); see David v. United States, 134 F.3d at 474 (citing
Hill v. United States, 368 U.S. 424, 426-27 (1962)); see also
Owens v. United States, 483 F.3d at 57 (setting forth standard
of review for section 2255 cases); see generally Wilder v.
United States, 806 F.3d 653, 658 (1st Cir. 2015) (setting out
standard of review for section 2255 claims).  The fourth
category includes only "assignments of error that reveal
'fundamental defect[s]' which, if uncorrected, will 'result in a
complete miscarriage of justice,' or irregularities that are
'inconsistent with the rudimentary demands of fair procedure.'"
David v. United States, 134 F.3d at 474.  Simply put, "apart

from claims of constitutional or jurisdictional nature, a cognizable section 2255 claim must reveal 'exceptional circumstances' that make the need for redress evident." <u>Id.</u> Defendant bears the burden of establishing the need for section 2255 relief. <u>Id.</u> To obtain relief under section 2255, defendant "must clear a significantly higher hurdle than would exist on direct appeal." <u>United States v. Frady</u>, 456 U.S. 152, 166 (1982). "Bald or conclusory assertions will not suffice to obtain relief under section 2255." See <u>Lema v. United States</u>, 987 F.2d 48, 51-52 (1st Cir. 1993).

II.  <u>Ineffective Assistance of Counsel Claim</u>

Defendant argues that several aspects of Donaldson's performance amounted to ineffective assistance of counsel. This court is not persuaded that any of the behavior defendant complains of would rise to the threshold of deficient conduct under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Much of the conduct defendant complains of falls well within the range of reasonable strategy. These instances did not, individually or cumulatively, deprive defendant of effective assistance of counsel. The government presented comprehensive evidence at trial proving that fraudulent activity had occurred at ECT and MSI, and defendant did not contest that it had occurred, only that other parties had undertaken the activity or that she was unaware of any violations. Essentially, the jury was asked to

determine the credibility of several witnesses.  During trial,
Donaldson skillfully cross-examined the government's witnesses
and ardently argued that their testimony should not be credited.
Defendant testified about the individuals she believed were
responsible for the fraud, as well as how her accountants had
misadvised her in tax matters.  The jury, however, did not
believe defendant's justifications, nor her version of the
events.

Claims of ineffective assistance of counsel are governed by
the well-established, two prong test in Strickland, 466 U.S. 668
(1984).  In order to succeed under the first prong of
Strickland, a defendant must demonstrate that, in light of all
the circumstances as they appeared at the time of the conduct,
counsel's representations fell below an objective standard of
reasonableness and "there is a reasonable probability that, but
for counsel's unprofessional errors, the result of the
proceeding would have been different."  Id. at 687-88, 694;
United States v. Mercedes-De La Cruz, 787 F.3d 61, 67 (1st Cir.
2015).  "Failure to make the required showing of either
deficient performance or sufficient prejudice defeats the
ineffectiveness claim."  Strickland, 466 U.S. at 700, 704; see
also United States v. Caramadre, 807 F.3d 359, 370-371 (1st Cir.
2015) (citing Turner v. United States, 699 F.3d 578, 584 (1st
Cir. 2012)) (defendant must demonstrate counsel's performance

fell below objective threshold of reasonable care and prejudiced him); accord Phoenix v. Matesanz, 233 F.3d 77, 81 (1st Cir. 2000).

An attorney's performance is deficient where it is "so inferior as to be objectively unreasonable." United States v. McGill, 11 F.3d at 266. Moreover, "'[t]here is a strong presumption that counsel has rendered adequate assistance and made all significant decisions for tactical reasons rather than through neglect.'" Barnes v. Hammer, 765 F.3d 810, 814 (8th Cir. 2014) (quoting Cullen v. Pinholster, 131 S.Ct. 1388, 1403-04 (2011)); Strickland, 466 U.S. at 689 ("strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'"). "Counsel's tactical judgment must be 'manifestly unreasonable' to constitute ineffective assistance of counsel." Castillo v. Matesanz, 348 F.3d 1, 11-12 (1st Cir. 2003). The presumption of reasonableness when reviewing counsel's tactical decisions also includes the level of emphasis placed on different legal arguments. See Tice v. Johnson, 647 F.3d 87, 102 (4th Cir. 2011) ("criminal defense attorney routinely faces thorny tactical decisions that may heavily bear on the defendant's life or liberty"). Overall, "judicial scrutiny of counsel's performance

must be highly deferential . . . a court must indulge a strong

presumption that counsel's conduct falls within the wide range

of reasonable professional assistance". Strickland, 466 U.S. at

689.

Accordingly, when filing a section 2255 motion, a

significant obstacle is posed by the deficient performance prong

if trial strategy is questioned.  It is "all too tempting for a

defendant to second-guess counsel's assistance after conviction

or adverse sentence, and it is all too easy for a court,

examining counsel's defense after it has proved unsuccessful, to

conclude that a particular act or omission of counsel was

unreasonable." Strickland, at 689.  Thus, an evaluation of

attorney performance requires that "every effort be made to

eliminate the distorting effects of hindsight." Id.  "[T]he

Constitution does not guarantee a defendant a letter-perfect

defense or a successful defense; rather, the performance

standard is that of reasonably effective assistance under

circumstances then obtaining." United States v. Natanel, 938

F.2d 302, 309-10 (1st Cir. 1991); accord Lema v. United States,

987 F.2d at 51; see also United States v. McGill, 11 F.3d at 227

("to avoid the shoals of ineffective assistance, an attorney's

judgment need not necessarily be right, so long as it is

reasonable").

Under the second prong of Strickland, defendant must show
that he was prejudiced by the errors of counsel.  Knight, 37
F.3d at 774.  The defendant has to show that "but for" their
counsel's errors, the result of the proceeding would have been
different.  Id. (citing Strickland, 466 U.S. at 687).
"[S]urmounting Strickland's high standards, is never an easy
task." See generally, Cullen v. Pinholster, 131 S.Ct. 1388
(2011) (citations omitted).

A.   Submission of Chalks to the Jury

Defendant argues that Donaldson was ineffective because he
consented to the suggestion of allowing the chalks into the jury
room during deliberations.  (Docket Entry # 200-2).  Defendant
contends that Donaldson's consent provided the jury with a "crib
sheet" to her conviction.  The government responds that, given
the cumulative nature of the chalks, Donaldson's decision to
assent to the jury receiving the chalks was neither ineffective
nor prejudicial.  (Docket Entry # 206).

When cumulative in nature, chalks submitted to the jury are
typically regarded as harmless.  United States v. Savarese, 686
F.3d 1, 4 (1st Cir. 2012) (citing United States v. Piper, 298
F.3d 47, 58 (1st Cir. 2002)).  Thus, as explained by the Eighth
Circuit in United States v. Warner, 428 F.2d 730 (8th Cir. 1970),
in the context of a prosecution for tax fraud, any error "in
sending to [the] jury room exhibits in [the] form of tax returns

with IRS audit reports attached which allegedly were not admitted into evidence was harmless where most information in reports stated nothing more than [what] jurors heard in testimony." Id. at 738; accord U.S. v. Treadwell, 760 F.2d 327, 339 & n.2 (D.C. Cir. 1985) (when "extraneous document submitted to the jury is merely cumulative of other, properly admitted evidence, the transmittal is harmless error") (summarizing Dallago v. U.S., 427 F.2d 546 (D.C.Cir. 1969), and collecting cases); see, e.g., U.S. v. Siragusa, 450 F.2d 592, 595 (2nd Cir. 1971) (existence of federal income tax booklet in jury room, which was not in evidence, not prejudicial because information was already introduced into evidence and booklet "added nothing" to "instructions already before the jury").  In concluding that the error was harmless, the Warner court also explained that the government's evidence was "virtually unrebutted."  Warner, 428 F.2d at 738; accord U.S. v. Savarese, 686 F.3d at 14 ("government's evidence of Savarese's guilt on the conspiracy charge was overwhelming, and any error related to the admission of [the] summary charts on that count was also harmless").

Here too, the testimony of government witnesses was overwhelming that defendant approved and oversaw the creation of false certifications.  The False Statement Counts chalk simply recounted the false statements charged in the Superseding Indictment with the corresponding admitted exhibits vis-à-vis

each statement supplemented with an additional column of admitted trial exhibits corresponding to Wong's testimony.

There was also an abundance of evidence that defendant knowingly misclassified MSI employees as independent contractors to avoid payroll tax payments.  Indeed, DeJusus and Korbey testified that they both explained to defendant how to differentiate an independent contractor from a W2 employee.  The existence of the "under-the-table" payroll and testimony from MSI employees reflected the widespread and well-known practice of mis-classifying MSI employees.  Agent Guidoboni testified about the IRS spreadsheet and his calculation of payroll taxes. During his testimony, Agent Guidoboni used the False Tax Return Counts chalk to illustrate the calculation of the tax owed in each of the 15 MSI quarterly tax filings with the additional column of his calculations.  Like the False Statement Counts chalk, the False Tax Return Counts chalk was based on exhibits admitted into evidence with the exception of the additional column of Agent Guidobani's calculations.

Agent Guidobani adopted the calculations on the witness stand thus making the column illustrative of his actual testimony admitted into the record.  Thus, given the cumulative nature of the chalk, defendant fails to meet her burden to establish that, but for allowing the chalk into the jury room, the result of the proceeding would have been different.

Similarly, the mail fraud counts chalk corresponded to the chart in the mail fraud charge in the Superseding Indictment with a column referencing admitted exhibits vis-à-vis the mailings MacDougal described.  Here again, because of the cumulative nature of the chalk, defendant fails to satisfy her burden to show that, but for allowing the chalk into the jury room, the result of the proceeding would have been different. Further, as the district judge pointed out, disregarding the insurance premium loss results in the same total offense level of 29.

In the alternative, the error in allowing the chalks to go to the jury room was not so inferior as to fall below an objective standard of reasonableness.  The chalks were sourced from exhibits already in evidence and reiterated in the prosecutor's closing argument.  Allowing them into the jury room in response to a note from the jury where they largely reflected the evidence in relation to counts in the Superseding Indictment was not objectively deficient performance.  Defendant fails in her burden to show that Donaldson's conduct was "so inferior as to be objectively unreasonable."  United States v. McGill, 11 F.3d at 266.

In sum, defendant fails in her burden to show both deficient performance and a reasonable probability that, but for the deficient performance of allowing the chalks to go to the

34

jury room, the result of the proceeding would have been different.

B.   <u>Failure to Hire Expert Witnesses</u>

Defendant's motion to vacate alleges that Donaldson's representation was deficient because of his failure to hire expert witnesses to challenge the government's loss calculus. (Docket Entry # 200-2).  Specifically, defendant claims the absence of a forensic tax expert during trial allowed the government's loss calculus to go unchallenged and left her responsible for an overstated restitution obligation.  (Docket Entry # 200-2).  Defendant also claims that Donaldson's failure to call an "expert witness to challenge and review" the trial testimony of Garcia-Garcia "allowed the jury to draw [negative] inferences" from his coerced and perjured testimony.  (Docket Entry # 200-2).  Defendant's motion does not specifically name the expert witness, nor which field of expertise would best serve to rebut Garcia-Garcia's testimony that, if called, would have provided information that would have "changed the outcome of [a] trial."  <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985).

In her motion to vacate, defendant's complaint that Donaldson was deficient by not providing expert testimony at trial fails to satisfy the two-prong test set forth by <u>Strickland</u>.  Defendant's complaint that a forensic tax expert should have been called at trial to challenge Agent Guidobani's

testimony, amounts to little more than a criticism of trial strategy and fails to establish that Donaldson's performance "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.  It also fails to address any actual instances of conduct which would rise to the level of ineffectiveness as required by Strickland.  It can hardly be said that Donaldson, by choosing to pursue a defense based on good faith, rather than challenging the existence of any fraudulent activity occurring or exposing defendant to a forensic accounting expert's cross-examination, acted ineffectively under the aforementioned standard.  Moreover, defendant's contention that her restitution obligation stems from Donaldson's failure to hire a forensic tax expert at trial is fundamentally flawed in that her restitution obligation was not decided at her trial, it was decided at her sentencing hearing, at which point she was represented by Attorney Hedges, who retained a forensic accountant precisely for the purpose of challenging the tax loss.  (Docket Entry ## 176 & 177).  The defensive strategy employed by Donaldson to defend the tax charges is best evidenced through defendant's own trial testimony stating that she had been following the advice of her accountants and she thought her practices were compliant. Defendant's complaint that Donaldson was deficient by not hiring a forensic accountant to rebut Agent Guidobani's testimony, or

dissect his loss calculus, can be resolved through a simple examination of plausible reasons Donaldson may have had for not offering such testimony.  (Docket Entry # 173, pp. 93-110) (Docket # 200-2).

Throughout defendant's trial, the government introduced extensive physical and testimonial evidence, which went largely uncontested, proving beyond a reasonable doubt that tax and insurance fraud had occurred at MSI.  It was clear that defendant had been compensating employees through two separate payroll accounts, one of which was used to pay workers directly without withholding, or reporting, any taxes whatsoever. (Docket Entry # 170, p. 55) (Docket Entry # 164, p. 34). Because defendant's defense never challenged the occurrence of the activity, only that she did not have knowledge of any wrongdoing, Donaldson's decision to not offer testimony from a tax expert who would likely face an incriminating cross-examination regarding the defects in defendant's accounting practices, falls directly into the type of decision routinely faced by trial attorneys and falls well "within the range of professionally reasonable judgments" under the circumstances. Strickland, 466 U.S. at 699; see United States v. Best, 219 F.3d 192, 201 (2nd Cir. 2000); Murden v. Artuz, 253 F.Supp.2d 376, 389 (E.D.N.Y. 2001) (stating that "in general, whether or not to hire an expert is the type of strategic choice by counsel that

may not be second-guessed on habeas corpus review"); see also
United States v. Lema, 987 F.2d 48, 54 (1st Cir. 1993) (stating
that failure to call a witness is generally a strategic issue
that does not constitute ineffective assistance of counsel).

Similar to defendant's previous complaint, this court finds
no merit in her allegation that Donaldson was ineffective by not
retaining an "expert witness to challenge and review the
testimony" of Garcia-Garcia.  (Docket Entry # 200-2).
Defendant's argument is unfounded.  Defendant has not identified
an expert who would provide such an opinion, or even a field of
expertise that would be appropriate.  (Docket Entry # 200-2)
(Docket Entry # 213).  Furthermore, because the point at issue
is a determination of credibility, the issue is not one for
which expert testimony was necessary or even appropriate.  See
F.R.E. 702 Advisory Committee Notes (expert testimony must be
the product of reliable principles and methods that are reliably
applied to the facts of the case); see also United States v.
Scop, 846 F.2d 135, 142 (2nd Cir. 1988) (expert witnesses may not
opine as to credibility of another witness's testimony - this is
a determination left solely to the jury); see also United States
v. Ward, 169 F.2d 460, 462 (3rd Cir. 1948) ("'expert' may not go
so far as to usurp the exclusive function of the jury to weigh
the evidence and determine credibility").  Throughout Garcia-
Garcia's trial testimony, he candidly provided details of the

cooperating witness agreement he had entered into with the United States Attorney's Office.  He testified that he hoped to receive a reduction in his sentence by testifying against Deleon and the agreement itself was entered into evidence for jurors to review.  (Docket Entry # 135, p. 33).  Donaldson's cross-examination of Garcia-Garcia was effective and distinctly purposed to impeach the witness's credibility.  During cross-examination, Donaldson evinced that since the time Garcia-Garcia had begun cooperating with the government he had been granted legal working status, a benefit which Garcia-Garcia denied was connected to his cooperation, his knowledge of possible theft at MSI's office and involvement in perpetrating much the document fraud at MSI.  (Docket Entry # 135, pp. 66-106).  It is clear from the record that Donaldson's performance at trial sufficiently called Garcia-Garcia's credibility into question such that Donaldson's performance falls well below the threshold of deficiency required to satisfy the first prong of <u>Strickland</u>.

Furthermore, defendant fails to show how she was prejudiced because, not only did the district court judge's jury charge specifically address the issue of witness credibility and provide the jury detailed instructions in how to make credibility assessments, it specifically cautioned the jury about the predeliction or motive of a witness who testifies

under a plea agreement, i.e. Garcia-Garcia, to testify falsely.[12]
(Docket Entry # 174, p. 68) (Docket Entry # 174, p. 71).
Accordingly, in the alternative, the claim can be denied on
defendant's failure to show that Donaldson's choice to not call
experts at trial prejudiced her defense such that, but for
Donaldson's errors, "the result of the trial or her sentence
would have been different."   Strickland, 466 U.S. at 694.

## C.   Failure to Discuss PSR

Defendant next complains that Donaldson's post-trial
representation, specifically his failure to review the PSR with
her, was ineffective.   In order to succeed on this claim,

---

[12]   The charge to the jury regarding Garcia-Garcia read:

> Now, the testimony of a witness who has testified pursuant
> to a plea and/or cooperation agreement with the government
> must be examined and considered with greater care and
> caution than the testimony of an ordinary witness.   You
> should bear in mind that a witness who has entered into
> such an agreement has an interest in this case different
> than an ordinary witness.   A witness who realizes that he
> may be able to obtain his freedom or receive a lighter
> sentence or obtain other benefits from the government by
> giving testimony favorable to the prosecution has a motive
> to testify falsely.   Therefore, you must examine the
> testimony with greater care and caution. You may consider
> whether the testimony was affected by interest or
> prejudice, personal gain or expectation of personal gain or
> expectation of favorable sentencing recommendations by the
> government.   In addition, the fact that one or more of the
> witnesses pled guilty to an offense is not evidence that
> the defendant in this case is guilty, and it cannot be
> considered by you in any way as evidence against the
> defendant.

(Docket Entry # 174, p. 71)

defendant must show that Donaldson's performance "fell below an
objective standard of reasonableness" by identifying specific
"acts or omissions of counsel that are alleged not to have been
the result of reasonable professional judgment." Strickland,
466 U.S. at 687-88.  Then, if such a showing is made, defendant
must then demonstrate that the deficiencies in Donaldson's
representation were prejudicial to her defense.  Id. at 692.
Defendant's argument regarding ineffective assistance post-trial
asserts that:

> Counsel Donaldson, was ineffective for not discussing the
> PSR or making any objections on behalf of Mrs. Deleon . . .
> whereas, sentencing counsel Hedges, filed a 77 page PSR on
> behalf of the defendant.  Counsel Hedges, efficiencies and
> excellent ethics accomplished a substantial reduction of
> restitution obligations on taxes losses and insurance
> losses . . . had Mrs. Deleon, continued to be represented
> by counsel Donaldson at sentencing, she was going to carry
> an extra charge.

(Docket Entry # 200, p. 3).  Defendant was convicted on November
19, 2008.  (Docket Entry # 174).  While the record is unclear
whether Donaldson and defendant had ever met to discuss
defendant's PSR, the record is clear that defendant was not
represented by Donaldson at sentencing.  On February 8, 2011,
Attorney Hedges was appointed to represent defendant at the
sentencing hearing.  (Docket Entry # 119).  Over the course of
her representation of Deleon, Attorney Hedges submitted 77
objections to defendant's PSR, two sealed submissions and she
retained an expert to challenge the loss amount.  In presenting

the argument, defendant praised the advocacy provided by
Attorney Hedges and then hypothesizes on the grim alternatives
possible had Donaldson represented her at sentencing.  (Docket
Entry # 200-2).  Defendant's speculative complaint only
contemplates non-existent events and is devoid of any actual
instance of Donaldson's conduct.  There is also an inadequate
showing of prejudice.

D.   Taking the Case to Trial and Advising Deleon to Testify

Defendant maintains that because of the high conviction
rate of cases that go to trial, Donaldson's advice to proceed to
trial and his suggestion for defendant to testify was
unreasonable.  (Docket Entry # 200-2).  She further contends
that because she testified, Donaldson's actions exposed her to a
harsh and severe sentence.  (Docket Entry # 200-2).  She submits
that Donaldson should have explained that taking the stand
"means 3 points higher in the sentencing guideline."  (Docket
Entry # 213).

"[U]naccompanied by coercion, legal advice concerning the
exercise of the right to testify infringes no right under
Strickland, but simply discharges defense counsel's ethical
responsibility to the accused."  Garuti v. Roden, 733 F.3d 18,
27 (brackets omitted).  Here, defendant acknowledges that
Donaldson counseled her to take the stand.  (Docket Entry # 200-
2) (questioning "[w]hat reasonable attorney would counsel a

42

client . . . to take the stand, knowing that a potential
increase of the level [of] points would expose the client to a
more severe sentence" but "[t]hat's what Carl Donaldson did at
DeLeon's trial").  Defendant makes no argument and provides no
facts indicating, let alone establishing, that Donaldson coerced
her to testify or even that she was ever in disagreement with
the choice.  She simply cites her regrets for exercising her
constitutional right to testify on her own behalf at trial.  See
generally Rock v. Arkansas, 483 U.S. 44, 49-52 (1987).  In any
event, any advice defendant received from Donaldson suggesting
or encouraging her to testify would not in itself be an
unreasonable strategic decision considering that her defense
hinged on her testimony regarding the underlying reasons which
could account for her actions.  In addition, the ineffectiveness
of counsel is not judged in hindsight.  At the time Donaldson
counseled defendant to take the stand, he had no means of
knowing that the court would, to use defendant's words,
"expose[] Deleon to 3-points higher sentence."  (Docket Entry #
213).

    In the alternative, defendant fails to show that, but for
the ineffective and objectively unreasonable advice, the result
of the proceeding would have been different.  Without her
testimony, the government's evidence remained overwhelming.
Moreover, the transcript of defendant's sentencing hearing

43

resolves defendant's claim surrounding the effect her testimony

had on her sentence.  (Docket Entry # 177).

> There are many, many reasons why you should be
> sentenced at the high end of the guideline range, but
> the Court is determined that a low-end sentence is
> sufficient under the guidelines to apply the
> appropriate punishment.  It would have considered the
> possibility of a variant sentence had you not fled and
> had you not obstructed justice, had you not caused
> great cost and time expense to the government by your
> obstruction of justice.  But it is concerned about the
> welfare of your child and about the fact that you do
> pose a low risk of recidivism as far as the Court is
> concerned.

(Docket Entry # 177, p. 51).

The enhanced sentence defendant complains of is therefore

not related to an instance of deficient representation by

Donaldson, as the court noted, it was only through defendant's

own decision to flee the country after being convicted that an

obstruction of justice enhancement ensued.  (Docket Entry # 177,

p. 51).  Defendant's decision to testify in her own defense also

had no bearing on the subsequent sentence she received thus

dispelling her claim that her testimony cast her in a more

negative light, exposing her to a harsher sentence.  Even so,

after weighing a number of factors, the court decided to issue a

sentence on the lower end of the sentencing guidelines, which

renders her complaints of being subjected to an unduly harsh

sentence meritless.  (Docket Entry # 177, pp. 49-51).  In short,

failing to show both ineffective assistance and prejudice, the argument does provide a basis for section 2255 relief.

E.   Delay in Forwarding and Unopened Defense Package

Defendant next alleges that Donaldson's delay in forwarding trial materials and a defense package to Attorney Hedges was ineffective assistance of counsel.  Defendant also points out that when Donaldson finally sent the box of materials to Attorney Hedges, unidentified "important mail" from the court and the government was "unopened."  (Docket Entry # 200-2).

Attorney Hedges filed a number of motions to continue the sentencing hearing due to the factual and legal complexity of the case as well as the belated production or non-production of discovery documents, transcripts and other documents from Donaldson.  (Docket Entry ## 120, 141, 149).  Donaldson eventually provided "a portion of the [case] file on May 2, 2011" to Attorney Hedges.  (Docket Entry # 150).  A few days later, she "received the final installments of the requested transcripts."  (Docket Entry # 149).  The court granted all of the motions to continue the sentencing thus allowing Attorney Hedges all of the time she requested to prepare for the sentencing notwithstanding Donaldson's belated production of a portion of a portion of the case file.  It is also worth noting that during the two-day sentencing hearing, Attorney Hedges never mentioned that the belated or incomplete production of the

material from Donaldson hindered her ability to eventually fully
prepare for the September 2011 sentencing proceedings.
Accordingly, defendant fails to show a reasonable probability
that, but for the ineffective assistance rendered by Donaldson
with respect to providing the case file to Attorney Hedges, the
result of the proceeding would have been different.

III. <u>Claim of Re-Sentencing under Alleyne</u>

In ground two, defendant maintains that she is entitled to
re-sentencing in light of the June 17, 2013 decision of <u>Alleyne</u>
<u>v. United States</u>, 133 S.Ct. 2151 (2013) ("<u>Allegre</u>").  Defendant
submits that, because of the holding in <u>Alleyne</u> stating that any
factor that increases the mandatory minimum sentence must be
proven beyond a reasonable doubt and submitted to the jury, she
is entitled to re-sentencing because the loss calculation
adopted by the court at defendant's sentencing was not
determined by the jury beyond a reasonable doubt.  (Docket Entry
# 200-3).  The government maintains that the statutes under
which defendant was convicted do not carry minimum mandatory
sentences.  Consequently, <u>Alleyne</u> does not apply (Docket Entry #
206).

A.   <u>The Alleyne Decision</u>

The Court in Alleyne "held that the Sixth Amendment right
to trial by jury requires that the Apprendi[13] doctrine applies
equally to facts that increase a mandatory minimum sentence."[14]
United States v. Harakaly, 734 F.3d 88, 94 (1st Cir. 2013).  The
Supreme Court in Apprendi "held that 'other than the fact of a
prior conviction, any fact that increases the penalty for a
crime beyond the prescribed statutory maximum, must be submitted
to a jury, and proved beyond a reasonable doubt.'"  Id. at 94
(quoting Apprendi, 530 U.S. at 490).  The Supreme Court in
Alleyne "extended the principles of Apprendi," United States v.
McIvery, 806 F.3d 645, 649 (1st Cir. 2015), petition for cert.
docketed, No. 15-8990 (2016), and held that "'any fact that
increases the mandatory minimum [sentence] is an "element" that
must be submitted to the jury.'"  U.S. v. Pizarro, 772 F.3d 284,
290 (1st Cir. 2014) (quoting Alleyne, 133 S.Ct. at 2155).  Simply
stated, "Alleyne extends Apprendi from maximum to minimum
sentences."  Crayton v. United States, 799 F.3d 623, 624 (7th
Cir.), cert. denied, 136 S. Ct. 424 (2015); accord United States
v. McIvery, 806 F.3d at 649.  As explained in Butterworth,
Alleyne was also "a new rule."  Butterworth v. United States,

---

[13] Apprendi v. United States, 530 U.S. 466 (2000).
[14] Alleyne overruled the 2002 decision in Harris v. United
States, 536 U.S. 545 (2002).  See United States v. Harakaly, 734
F.3d 88, 94 (1st Cir. 2013).  Harris "distinguished facts that
increase a sentence beyond a statutory maximum from facts that
trigger or increase a mandatory minimum sentence."  Id. at 93.

775 F.3d 459, 465 (1st Cir.), <u>cert.</u> <u>denied</u>, 135 S.Ct. 1517 (2015).

In the case at bar, defendant's conviction became "final" in November 2013, when the Supreme Court denied the petition for a writ of certiorari. <u>See</u> <u>Clay v. United States</u>, 537 U.S. 522, 527 (2003); <u>Griffith v. Kentucky</u>, 479 U.S. 314, 321 n.6 & 327 (1987). Assuming for purposes of argument that petitioner somehow avoids the retroactivity bar, the new <u>Alleyne</u> rule does not provide section 2255 relief when applied to his conviction and sentence because <u>Alleyne</u> applies "only where an enhanced mandatory minimum applies." <u>United States v. Rose</u>, 802 F.3d 114, 127 (1st Cir. 2015) ("'failing to prove an individualized drug quantity is an <i>Alleyne</i> error only in cases in which the defendant has been convicted and <i>sentenced</i> under the aggravated version of the statute-that is, where an enhanced mandatory minimum applies'"), <u>petition</u> <u>for</u> <u>cert.</u> <u>filed</u>, (No. 15-8916) (2016); <u>Savarese v. United States</u>, 2013 WL 5537343, at *2 (D.Mass. Oct. 7, 2013) ("for <i>Alleyne</i> to apply, a sentencing enhancement must trigger a mandatory minimum sentence").

Here, defendant was convicted of violations of 18 U.S.C. §§ 371, 1001 and 1341 and 26 U.S.C. § 7206(2). None of these statutes carry mandatory minimum sentences or, more to the point, carried mandatory minimum sentences at the time of defendant's sentencing. "There is no mandatory minimum term of

incarceration for a conspiracy alleged under 18 U.S.C. § 371."

United States v. McFarlin, 535 F.3d 808, 810 (8th Cir. 2008);

accord United States v. White, 71 F.3d 920, 922 (D.C.Cir. 1995)

(18 U.S.C. § 371 provides "no mandatory minimum"); United States

v. Sedlak, 2015 WL 1033981, at *5 (M.D.Pa. March 10, 2015)

(rejecting challenge based on Alleyne and noting "[t]here are no

statutory minimum sentences for Count 1, the conspiracy charge

under 18 U.S.C. § 371"), appeal filed, No. 15-2446 (3rd Cir. June

11, 2015).  Likewise, there is no mandatory minimum sentence for

mail fraud under 18 U.S.C. § 1341.  See United States v. Hinson,

2015 WL 400985, at *4 (E.D.Mich. Jan. 28, 2015) (with respect to

the mail fraud conviction, "Defendant faced no statutory

mandatory minimum term of imprisonment"); United States v.

Damayo, 2015 WL 4092456, at *2, 4, n.4 (N.D.Ga. July 6, 2015)

(recognizing, with respect to Count Seven for mail fraud, 18

U.S.C. § 1341, "that there was no mandatory minimum term of

imprisonment for Count Seven").  The tax fraud conviction also

does not carry a mandatory minimum term of imprisonment.  See

United States v. Lee, 359 F.3d 194, 210 (3rd Cir. 2004)

(recognizing there was no mandatory minimum term of imprisonment

for tax offenses under 26 U.S.C. § 7206(2)).  Finally, the

convictions under 18 U.S.C. § 1001 ("section 1001") carried a

fine and imprisonment of "not more than 5 years."  18 U.S.C. §

1001.  Section 1001 therefore did not impose a mandatory minimum sentence.

In this circuit, "factual findings made for purposes of applying the Guidelines, which influence the sentencing judge's discretion in imposing an advisory Guidelines sentence and do not result in imposition of a mandatory minimum sentence, do not violate the rule in *Alleyne*."  United States v. Ramírez-Negrón, 751 F.3d 42, 48 (1st Cir.), cert. denied, 135 S.Ct. 276 (2014), and cert. denied sub nom., Alvarado-Merced v. U.S., 135 S.Ct. 283 (2014); see United States v. George, 761 F.3d 42, 60 (1st Cir. 2014) ("because the enhancement did not increase a statutory maximum or minimum sentence, the judge did nothing wrong here") (rejecting argument under Apprendi and Alleyne). Any fact finding during sentencing was employed to determine the guidelines range and not to increase a mandatory minimum sentence.  See Fury v. United States, 2015 WL 3885296, at *8 (D.Me. June 24, 2015), appeal docketed, No. 15-1905 (1st Cir. Aug. 6, 2015).[15]  Accordingly, there was no Alleyne error.

---

[15]  As noted in Fury: in rejecting an Alleyne argument:

> Petitioner was not sentenced based on a statutory minimum mandatory sentence; instead, Petitioner was convicted of violating 18 U.S.C. § 81, which has no minimum sentence, but which carries a maximum sentence of 25 years, or a maximum sentence of life in prison if the life of any person was placed in jeopardy.  The judicial factfinding

In any event, even if there was an error under <u>Alleyne</u>, it was harmless.  <u>See</u> <u>generally</u> <u>United States v. McIvery</u>, 806 F.3d at 650 (addressing <u>Alleyne</u> error and stating that, "[c]onsistent with *Harakaly*, the appropriate standard of review is for harmless error").  Petitioner was not subjected to any harm because none of the statutes carried mandatory minimum sentences.  <u>See</u> <u>United States v. Razo</u>, 782 F.3d 31, 40 (1st Cir.), <u>cert.</u> <u>denied</u>, 136 S.Ct. 176 (2015) ("Razo was not subjected to a minimum that could possibly have caused him any harm, as the minimum applied-zero years-was no minimum at all").

CONCLUSION

Based on the foregoing reasons, this court **RECOMMENDS**[16] that the section 2255 motion (Docket Entry # 200) be **DENIED**.

                    /s/ Marianne B. Bowler
                    **MARIANNE B. BOWLER**
                    United States Magistrate Judge

---

    was employed to determine the guidelines range, and not to
    impose a mandatory minimum sentence.

<u>Fury v. United States</u>, 2015 WL 3885296, at *8.

[16]  Any objections to the Report and Recommendation must be filed with the Clerk of Court with 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  <u>See</u> Rule 72(b), Fed. R. Civ. P.  Any party may respond to another party's objection with 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.